Electronically Filed
Intermediate Court of Appeals
29651
17-MAY-2012
10:08 AM

NO. 29651

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


·STATE OF HAWAI'I, Plaintiff-Appellee, v.
MALCOLM G. YORKSTON, III, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CR. NO. 06-1-0685)


MEMORANDUM OPINION
(By:  Foley, Presiding Judge, Fujise and Leonard JJ.)


Defendant-Appellant Malcolm G. Yorkston, III (**Yorkston**) appeals from the Judgment of Conviction and Probation Sentence/Notice of Entry entered in the Circuit Court of the First Circuit (**Circuit Court**) on February 11, 2009.[1] Following a jury-waived trial, the Circuit Court convicted Yorkston of sexual assault in the fourth degree under Hawaii Revised Statutes (**HRS**) § 707-733(1)(a) (1993).[2] On appeal, Yorkston contends

---

[1]     The Honorable Richard K. Perkins presided.

[2]     This section provides:

§ 707-733. **Sexual assault in the fourth degree.** (1) A person commits the offense of sexual assault in the fourth degree if:

    (a)    The person knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion.

that: (1) there is insufficient evidence to support the conviction; (2) the Circuit Court erred in failing to notify the parties prior to closing arguments of its intention to consider a lesser included offense; and (3) the Circuit Court erred in concluding it had no discretion to enter restitution in an amount different from that ordered by the Crime Victim Compensation Commission. We conclude that there is insufficient evidence to support the conviction and, accordingly, reverse.

I.   BACKGROUND

A.   The Charge

A grand jury issued an indictment against Yorkston and his co-defendant, Johnnie Martin Stevens (**Stevens**), on April 6, 2006. The indictment charged Yorkston with the following offenses: (1) Count VI - Sexual Assault in the Second Degree by "knowingly subjecting [Complainant] to an act of sexual penetration by compulsion, by placing his finger into her genital opening"; (2) Count VII - Sexual Assault in the Second Degree by "attempting to place his penis in [Complainant's] genital opening"; (3) Count VIII - Sexual Assault in the Fourth Degree by "placing his hand on [Complainant's] breast"; and (4) Count IX - Sexual Assault in the Fourth Degree by "placing his mouth on [Complainant's] breast." The indictment charged Stevens with similar offenses, all of which allegedly occurred on May 2, 2005.

B.   The Trial

At a joint bench trial, Yorkston, Stevens, and the complaining witness (**Complainant**) all testified to the events surrounding the alleged assault. All testified that the events took place in Stevens' bedroom. No one else was present in the bedroom when the events occurred.

Their testimonies are largely consistent regarding the events leading up to the alleged assault. Complainant, who was 29 years old at the time, had recently moved to Hawai'i. She met Yorkston and Stevens through a running club called the Aloha Hash

2

House Harriers (**Harriers**).  Complainant initially met Yorkston at a Harriers social event on April 30, 2005.  Yorkston testified that he recognized Complainant because she had been posting sexually explicit material on the Harriers' website.  He believed she was "showing herself to be . . . a partier."

At the Harriers event, Complainant told Yorkston about a social group she had started called the Sad Lonely Losers Club.  Yorkston testified that Complainant told him, "I like it in the middle," and "[I like] things to get wild."  At a Harriers event the next day, Yorkston invited Complainant to a "moving party" at Stevens' apartment that would take place the following day.[3]  The purpose of the get-together was to move boxes and say goodbye to Stevens, who had been reassigned to the mainland.  Yorkston mentioned that Stevens's apartment complex had a pool and Jacuzzi.

The following day, May 2nd, Complainant e-mailed Yorkston information about the Sad Lonely Losers Club, including a link to its website.  Yorkston testified that Complainant had posted "very explicit and very sexual" material on the website.  Yorkston replied via e-mail with his phone number so they could coordinate going to Stevens's moving party that night.  He also wrote that he wanted to "make [her] wet in the jacuzzi."

After work that night, Yorkston picked up Complainant and they stopped at a liquor store and purchased a bottle of wine and a twelve-pack of beer.  Because Yorkston had forgotten his ID, Complainant purchased the alcohol and he reimbursed her.

Yorkston and Complainant arrived at Stevens's apartment in a high-rise building in downtown Honolulu at around 8:30 p.m.  Stevens's two roommates were in the living room.  After about forty-five minutes, when Complainant, Yorkston, and Stevens had

---

[3]     Yorkston and Stevens both testified that they were discussing plans for moving boxes and hanging out at the Jacuzzi.  Complainant overheard them talking, said "Hey, I like Jacuzzis," and asked if she could come along.

finished the bottle of wine, Complainant suggested that they go to the Jacuzzi.  They continued to drink beer at the Jacuzzi. While in the Jacuzzi, Yorkston and Stevens both massaged Complainant's feet.  The defendants testified that Complainant talked about sexually explicit material pertaining to her relationship with another man in the running club.  Stevens testified that he was "turned on" by the discussion.

At some point while they were in the Jacuzzi, Yorkston moved in between Complainant's legs and touched her thigh. Complainant pushed or slapped his hand away and told him no. Yorkston testified that Complainant said "[O]h, come on, stop" in a joking way because other people were around.  Complainant testified that other than the thigh-touching incident, she consented to the foot massage.

The pool and Jacuzzi closed around 10:00 p.m., and the three went back up to the apartment.  Stevens's roommates were still in the living room.  The three went into Stevens's bedroom. For ten to fifteen minutes, Yorkston and Stevens discussed moving plans while Complainant sat on the bed, still wearing her one-piece bathing suit.  At this point, Complainant's story and that of Yorkston and Stevens diverged.

1.    Complainant's testimony

Complainant testified that the next thing she remembered was waking up on the bed.  When she woke up, the lights were off, the door was closed, her bathing suit was off, and Yorkston and Stevens were "doing stuff to [her]."  Stevens was completely naked and Yorkston wore a t-shirt but was naked below the waist.  They kissed her mouth, kissed and touched her breasts, and alternated between the top and bottom of her body. Complainant felt as though she were in a "live coma where you can see things going on and you're trying to move and do things, but you can't.  You're not quite there."  On cross-examination, she confirmed her statements to a detective that "[S]omething came

over me where I couldn't talk," and "It was like I was paralyzed
. . . I just kept trying to talk, and I couldn't." She told the
detective that something "knocked me out" as if "there was some
type of like electromagnetic shield thing that was just hovering
over me." She further told him she believed the defendants had
drugged her.[4]

On direct examination, Complainant testified that while
the defendants were alternating between the top and lower
portions of her body, she tried to mumble:

Q       Were you able to say anything to [the defendants] when
        this was occurring?
A       I remember trying to mumble. Again, I'm not sure if
        it was audible or not. I didn't get a response from
        them.
Q       Okay. And do you recall them saying anything to you?
A       As far as me saying to stop, no. I didn't get any
        response as far as that.

Stevens "went down on" Complainant, but then began
feeling sick and went to the bathroom to vomit. Yorkston told
her, "I'm going to have you tonight, tomorrow, and the next
week." She then testified in detail as to Yorkston's first
attempt at penetration:

He was standing at the bottom of the bed, and he had my legs
up in the air. And I kept trying to cross them as best I
could, and he wasn't able to, you know, try to stick his
penis in because I kept trying to move and as best I could
to try to not allow that to happen. So then he puts his
hand in my vagina, and then he pulls out my tampon and says,
Oh, this is why you're putting up a fight.

Complainant testified vaguely as to a second attempt at
penetration that occurred immediately after Yorkston removed the
tampon:

Q       When Malcolm [Yorkston] was attempting penetration
        [the first time], was Johnnie [Stevens] in the room or

---

[4]     At trial, Complainant admitted that she was taking various
prescription medications at the time of these events, including narcotics.
Several of them carried warnings about adverse interactions with alcohol that
could intensify drowsiness. She testified that she had taken them for quite
some time, knew how they would interact with alcohol, and was careful not to
take "all the narcotics at once with alcohol." Yorkston testified that in the
car on the way to Stevens's apartment, Complainant told him she popped pills,
including Valium and Percodan.

```
          not?
A         Well, after he took my tampon out is when I think
          Johnnie left, and then Malcolm was attempting it
          again.
Q         So when Malcolm is attempting, what is he saying to
          you?
A         At this point I think he decided to stop, and he said,
          We need to get her out of here.
```

She testified that she heard Yorkston and Stevens walk in with a camera and try to take pictures of her. She heard Yorkston say the flash wouldn't go off. The lights were still off at that time.

Complainant testified that after the camera incident, "[w]hen [Stevens] was kissing me, his penis did rub up against my face." The defendants then stopped, put her bathing suit back on, and turned on the lights. Complainant was "slowly coming to" but felt that she was still in danger. Yorkston and Stevens were moving boxes, the bedroom door was open, and the lights were on.

Yorkston and Stevens then returned to the bedroom with the camera. Yorkston moved her bathing suit bottom to the side and started trying to take pictures of her again. Complainant testified that it was at this point was the first time she recalled being able to talk. Stevens attempted to "kiss [her] and touch [her] breast again." Complainant kicked Yorkston and scratched at both defendants' faces. An altercation ensued. Yorkston ran out of the room, away from the brawl, while Stevens tried to restrain Complainant. Stevens's roommates summoned the security guards. Complainant then went down to the lobby, where she called the police. She identified Yorkston and Stevens as they were carrying luggage out of the apartment. Complainant testified that she did not consent to any of the sex acts.

2.    The Remaining Testimony

Yorkston's and Stevens's testimonies were largely consistent with each other.[5/]  After the Jacuzzi, the three went into Stevens's bedroom.  They were sitting on the bed, with Complainant in the middle, when Complainant began kissing Yorkston.  Complainant's swimsuit top came down at some point, and Yorkston and Stevens touched and kissed her breasts.  Stevens testified that when he "went to touch her the first time," she crossed her legs but did not say no.  He took that to mean she "just didn't want [him] touching down there at the moment."

Stevens left the room to vomit for the first time, having fallen ill from mixing alcohol.  When he returned, he saw Complainant's "legs apart and Malcolm standing in front of her." Yorkston testified that he was standing or kneeling between Complainant's legs and rubbed his crotch area, through his underwear, against her "bathing suit crotch area." He did not specify when this occurred.  Yorkston denied that he told Complainant "I'm going to have you tonight, tomorrow, and next week," and he denied removing her tampon.

Stevens testified that he touched and placed his mouth on Complainant's genitalia and then left the room to vomit for the second time, again ill from mixing alcohol.  When he returned to the bedroom, he saw a tampon on the floor.  He continued to kiss Complainant and touch her breasts.  Sometime thereafter, he heard Complainant clearly say no.  He and Yorkston stopped and helped Complainant pull her swimsuit top back up.  He then left the room to vomit for a third time.  When he returned to the bedroom to put his shorts on, Yorkston was packing boxes and Complainant was lying on the bed, apparently asleep.

---

[5/]    Yorkston admitted on direct examination that he had denied the occurrence of any sexual activity in his initial interview with a detective. He said he lied because he was scared about being in jail, concerned about losing his job, and worried that his pregnant wife would leave him.

Yorkston testified that he found Stevens's repeated vomiting "disturbing" and was unable to maintain an erection. The mood passed and the sexual activity "just petered out." At that point, Complainant said stop "and that was it." Both defendants testified that Complainant consented to the sexual activity up until it ended when she said stop.

After Complainant said no, Stevens left the room and Yorkston began packing boxes. He found Stevens's camera and decided to take a picture of Complainant for Stevens to find when he was away at sea. At that time, Complainant was lying back on the bed with her hand over her eyes. Yorkston pulled the bottom of her bathing suit aside and tried to take a picture, but the flash would not go off. Complainant told him, "I know what you're trying to do to me . . . . You're going to try to rape me." She then kicked the camera. Stevens came back into the room, and both defendants testified that Yorkston was initially up against the wall and then ran out of the room. Stevens testified that Complainant was yelling, "I know what you guys are trying to do to me. You guys are trying to rape me, drug me. You guys are assholes." Complainant attacked Stevens and he "wrestl[ed] her to the ground" several times to prevent her from hitting him. One of Stevens's roommates observed the altercation and testified that Stevens restrained Complainant defensively to prevent her from hitting him. The roommate recalled that Complainant broke several lamps and attempted to hit Stevens with them. He further described Complainant as angry, hostile, and yelling profanities at a very loud volume.

The responding police officer testified that he was called to the apartment complex on a report of a disorderly female. When he arrived in the apartment lobby, he found Complainant yelling at the security guards. He could smell

alcohol on her from three to four feet away. It took him about fifteen minutes to get Complainant to lower her voice.

3. Findings and Verdict

At the conclusion of the bench trial, the Circuit Court acquitted Stevens on all counts. It convicted Yorkston of fourth-degree sexual assault, a lesser offense included in the second-degree sexual assault charge (Count VII). The court entered oral findings in conjunction with the verdict:

> Generally, the counts alleged in this case require among other things that the defendant act knowingly as to the attendant circumstance of compulsion. A person acts knowingly with respect to attendant circumstances when he is aware that such circumstances exist, and compulsion is defined, essentially, as absence of consent. So, the prosecution must prove beyond a reasonable doubt that as to each count, the defendant was aware that what he did or, in the case of Count 7, intended to do was without the complainant's consent. Although I am not necessarily of the belief that the complainant consented to any of the sexual activities shown by the evidence to have occurred in defendant Stevens' room on May 2nd, 2005, I find that with the exception of Count 7, the prosecution has failed to prove the state of mind applicable to the element of compulsion as to each count of the indictment.

> By her own testimony, the complainant was unable, for whatever reason, to communicate unequivocally to the defendants that she wanted them to stop until most, if not all, of the sexual activity alleged in the indictment had ended. This together with the largely undisputed evidence relating to the conduct of the complainant leading up to the acts charged is sufficient to raise a reasonable doubt as to whether the defendants were aware that they did not have complainant's consent to do what they did.

> Now, accordingly, I am finding defendant Stevens not guilty of Counts 1, 2, 4, and 5, and defendant Yorkston not guilty of Counts 6, 8, and 9.

> Now, Count 7 alleges an attempt on the part of defendant Yorkston to commit sexual assault in the second degree. The Court finds credible the complainant's testimony that she believed that Yorkston attempted to penetrate her twice. According to the complainant, the first time was sometime after Stevens put his mouth on her genitals but before Yorkston removed her tampon. Now, I'm finding that both of these events -- the placing of Stevens' mouth on the complainant's genitals and Yorkston's removal of the tampon -- occurred, in fact.

> At this point, Yorkston was naked from the waist down but could not make penetration because the complainant had crossed her legs. The second time was after her tampon was removed and after Stevens left the room. The complainant

9

did not say specifically whether Yorkston was clothed or unclothed at the time, but it was shortly after the second attempt that Yorkston stopped his sexual advances until the camera incident, when he pulled the crotch of the complainant's suit aside and attempted to take a photograph.

Now, each defendant has admitted in testimony that at some point in time during the events of May 2nd, 2005, the complainant said no, or stop, and he became aware that any further sexual activity with the complainant would not have been consensual.  A key question concerning Count 7 is whether it occurred before or after that point.

According to Stevens, he was not present when the tampon was removed but returned from his second vomiting episode to see it lying on the floor.  At that point, he says he began kissing the complainant's breasts.  She said no and they stopped.  He then left the room.  Yorkston's testimony also indicates that Stevens left the room after the complainant said stop.

I find that what the complainant referred to as Yorkston's second attempt at penetration occurred after the complainant said no, or stop, and both Yorkston and Stevens were aware that the complainant was not consenting to any further sexual activity.  I further find that what the complainant referred to as Yorkston's second attempt at penetration consisted in his rubbing his crotch through his underwear against the complainant's crotch through her bathing suit, which Yorkston admits having done.  There were only two attempts at penetration, according to the complainant, and during the first attempt, Yorkston was not wearing any underwear.

This rubbing of crotches clearly meets the definition of sexual contact, but is it a substantial enough step to make Yorkston guilty of attempted sexual assault in the second degree?

HRS Section 705-503 provides that conduct shall not be considered a substantial step, unless it is strongly corroborative of the defendant's criminal intent.  Here, Yorkston and the complainant were both clothed.  Yorkston did not proceed beyond the rubbing, and he stopped shortly thereafter.  Under the circumstances, this was not a substantial step in a course of conduct intended to culminate in the crime of sexual assault in the second degree, which requires proof of knowing sexual penetration by compulsion.

I do find, however, that all of the essential elements of the included offense of sexual assault in the fourth degree in violation of Section 707-733(1)(a) have been proved beyond a reasonable doubt.  I also find that the Court has jurisdiction, that venue is proper, and that the offense established under Count 7 was committed within the period specified by the applicable statute of limitations. Accordingly, I find defendant Yorkston guilty of sexual assault in the fourth degree in Count 7.

The Circuit Court imposed a one-year probation sentence and ordered Yorkston to pay restitution in the amount ordered by the Crime Victim Compensation Commission. On February 24, 2009, it entered a Free Standing Order of Restitution against Yorkston in the amount of $8,119.56. Yorkston filed a timely notice of appeal on February 20, 2009.

II. POINTS OF ERROR

Yorkston asserts the following points of error on appeal:

(1) The Circuit Court erred in adjudging Yorkston guilty because there is no substantial evidence that Yorkston subjected Complainant to sexual contact after she said no;

(2) The Circuit Court erred in failing to inform the parties prior to closing arguments that it would consider sexual assault in the fourth degree as a lesser offense included in Count VII; and

(3) The Circuit Court erred in concluding it had no discretion to enter a restitution order in an amount different from that ordered by the Crime Victim Compensation Fund.

III. APPLICABLE STANDARD OF REVIEW

> [E]vidence adduced in the trial court must be considered in the strongest light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

State v. Richie, 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citation omitted). "Substantial evidence as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. (internal quotation marks and citation omitted).

IV. DISCUSSION

    A.    No Substantial Evidence of Mens Rea for Count VII

        Yorkston argues there is insufficient evidence to support the conviction for fourth-degree sexual assault, a lesser offense included in Count VII, because essential findings are unsupported by the testimony at trial, including the Complainant's own testimony. He maintains there is no substantial evidence in support of the conviction. Upon careful examination of the record, we agree.

        The test for sufficiency of the evidence is whether there is "substantial evidence" for each material element of the offense. State v. Matavale, 115 Hawai'i 149, 157-58, 166 P.3d 322, 330-31 (2007) (quoting State v. Batson, 73 Haw. 236, 248-49, 831 P.2d 924, 931 (1992)). Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." Id. at 158, 166 P.3d at 331 (quoting Batson, 73 Haw. at 248-49, 831 P.2d at 931) (brackets omitted). The test is not whether guilt has been established beyond a reasonable doubt. State v. Bayly, 118 Hawai'i 1, 6, 185 P.3d 186, 191 (2008).

        In a bench trial, the trial judge is entitled "to make all reasonable and rational inferences under the facts in evidence, including circumstantial evidence." Batson, 73 Haw. at 249, 831 P.2d at 931. It is not the role of the appellate court to weigh credibility or resolve conflicting evidence. State v. Eastman, 81 Hawai'i 131, 139, 913 P.2d 57, 65 (1996); accord State v. Ferm, 94 Hawai'i 17, 27, 7 P.3d 193, 203 (App. 2000); State v. Wallace, 80 Hawai'i 382, 418, 910 P.2d 685, 731 (1996). In considering sufficiency, we must view the evidence in the light most favorable to the prosecution. Bayly, 118 Hawai'i at 6, 185 P.3d at 191. Here, we must determine whether substantial evidence supports the elements of fourth-degree sexual assault.

12

A person commits sexual assault in the fourth degree when he or she "knowingly subjects another person to sexual contact by compulsion or causes another person to have sexual contact with the actor by compulsion." HRS § 707-733(1)(a). Compulsion is defined as the absence of consent. HRS § 707-700 (1993). The material elements of fourth-degree sexual assault are, in their basic form: (1) a knowing *mens rea*; (2) sexual contact; and (3) absence of consent.

There is substantial evidence in support of the second element -- that the sexual contact, referred to as a second attempt at penetration,[6] in fact occurred. Complainant testified that just after Yorkston removed her tampon and Stevens left the room, Yorkston made a second attempt at penetration. Yorkston admitted that he rubbed his crotch area against Complainant's, through their clothes, while he was standing or kneeling between her legs.

There is also substantial evidence in support of the third element -- that Complainant did not, in fact, consent. Complainant testified that she did not consent to any of the sex acts that occurred.

The pivotal element here, however, is the *mens rea*, which requires the actor to be aware of the attendant circumstances, including the complainant's lack of consent. State v. Adams, 10 Haw. App. 593, 606-07, 880 P.2d 226, 234-35 (1994); see also State v. Kinnane, 79 Hawai'i 46, 53-54, 897 P.2d 973, 980-81 (1995); HRS §§ 702-206(2) (1993) (defining "knowingly") & 702-218 (1993) (mistake of fact). Yorkston's conviction turned on the critical finding of when exactly the defendants heard Complainant say no. The court expressly found

---

[6] Although the court referred to this act as an attempt at penetration, it ultimately concluded that it was "not a substantial step in a course of conduct intended to culminate in the crime of sexual assault in the second degree." For the sake of convenience, however, we will refer to it as the second attempt at penetration.

reasonable doubt as to whether Complainant had unequivocally conveyed her lack of consent before that point.  Both defendants consistently maintained that they did not hear her say no until the very end of the time line, when the sexual activity ceased. The Complainant's testimony was that, although she was "trying to mumble" earlier, she was not able to talk "until when they tried to take pictures the second time, and I said, what – what are you – what are you doing?"  Complainant's own testimony, as well as that of the defendants, does not give rise to a reasonable inference that they heard her say no *before* Yorkston's second attempt at penetration, which occurred significantly earlier than the second attempt at picture-taking.

Regardless of any inferences that might be drawn from Complainant's mumbling, the Circuit Court expressly found reasonable doubt as to whether she adequately conveyed her lack of consent before the defendants, according to their own testimony, heard her say no.  Yorkston and Stevens were both very clear about when they heard Complainant say no.  Stevens testified that after he returned from vomiting the second time, he resumed kissing and touching Complainant's breasts. Complainant then said no, everything stopped, and he and Yorkston helped her pull her top up.  Likewise, Yorkston testified that after Stevens returned from vomiting the second time, Complainant said no and the sexual activity stopped.

Yorkston and Stevens both testified that after Complainant said no, Stevens left the room.  Stevens testified that he left to vomit for a third time and then returned to the bedroom to put on his shorts.  He saw Yorkston packing boxes, and Complainant appeared to be asleep on the bed.  Yorkston's with Stevens's account:  after Stevens left, Yorkston got dressed and began packing boxes.  Complainant was laying on the bed with her hand over her eyes.  Complainant similarly testified that after the lights came on, she was lying back on the bed to recover her

strength.  At that point, Yorkston attempted to photograph Complainant's crotch, the second attempt at picture-taking. Stevens returned to the bedroom to find Complainant yelling at Yorkston, who was up against the wall.

Despite all three testimonies to the contrary, the court found that the second attempt at penetration occurred after Yorkston and Stevens both heard Complainant say no.  In so finding, the court apparently confused the second time that Stevens left the room, in the middle of the time line, with the third time he left, after which their sexual activity ceased and Yorkston began packing boxes.  Complainant's own testimony was that the second attempt occurred just after the first, while Stevens was out of the room for the first time.  During the first attempt, Yorkston was standing in between Complainant's legs. He then removed her tampon, after which Stevens left the room. Yorkston then made the second attempt at penetration.  In contrast, both Yorkston and Stevens testified that after they heard Complainant say no, all sexual activity stopped and Stevens left the room for the third time.

There is no evidence that the second attempt at penetration occurred after Stevens left the room for the third time.  Complainant's own testimony was that the second attempt occurred right after the first, just after Yorkston removed the tampon and after Stevens had left for the first time.  The testimony of all three was consistent that after Stevens left the room for the third time, the lights were on, Yorkston began packing boxes, and Complainant was lying back on the bed.

The court's own findings undermine its ultimate conclusion.  The court found that Yorkston's second attempt at penetration occurred just after he removed her tampon, while Stevens was out of the room.  Stevens returned to see the tampon on the floor.  He resumed kissing Complainant's breasts; then "[s]he said no and they stopped."  These findings affirm that the

second attempt occurred *before* Complainant said no.  Nonetheless, the court went on to conclude that the second attempt occurred *after* both defendants heard Complainant say no.

The Circuit Court faced a difficult task in piecing together days of convoluted testimony.  Although it was entitled to draw inferences from the evidence, those inferences must still have been reasonable.  Batson, 73 Haw. at 249, 831 P.2d at 931. *A fortiori,* there must have been some evidentiary basis from which to draw those inferences.  Id.  Here, the court was not faced with conflicting testimony regarding the timing of the second attempt and the timing of when Yorkston heard Complainant say no.  Each of these critical facts was adduced by uncontroverted testimony.  There was simply no evidence to support the Circuit Court's timing of the facts critical to the conviction.  C.f. State v. Jackson, 81 Hawai'i 39, 43, 46, 912 P.2d 71, 75, 78 (1996) (holding there was sufficient evidence where complainant testified she was crying, repeatedly said no, attempted to pull away, and told defendant she did not want to touch him).

In addition, we note that Complainant's testimony that she clenched her mouth and crossed her legs arguably could have supported the *mens rea* element of the conviction.  However, the Circuit Court specifically found that although the leg-crossing occurred, Complainant was unable to convey her lack of consent until "most, if not all, of the sexual activity alleged in the indictment had ended."  It found a reasonable doubt as to the *mens rea* element until the defendants heard Complainant say no. The Circuit Court thus declined to convict on the basis of Complainant's testimony regarding her leg-crossing and mouth-clenching.  As this finding concerns "the ultimate issue of guilt," we may not affirm the conviction on the basis of evidence that the trier of fact expressly rejected.  See State v. Alsip, 2 Haw. App. 259, 262, 630 P.2d 126, 128 (1981) ("It is well-settled

that in reviewing a decision rendered in a case tried by the court without a jury, an appellate court will indulge every reasonable presumption in favor of findings made by the court below *as the basis of its decision*.") (emphasis added); <u>Batson</u>, 73 Haw. at 246, 831 P.2d at 930 ("[F]indings of the trial court will not be disturbed unless clearly erroneous"); <u>accord</u> <u>State v. Gabrillo</u>, 10 Haw. App. 448, 459 n.7, 877 P.2d 891, 896 n.7 (1994); <u>Eastman</u>, 81 Hawai'i at 139, 913 P.2d at 65 ("It is for the trial judge as fact-finder to assess the credibility of witnesses and to resolve all questions of fact; the judge may accept or reject any witness's testimony in whole or in part.").

Finally, the State argues that the testimony regarding the second camera incident was sufficient to support a conviction of fourth-degree sexual assault.  The Circuit Court did not reference the camera incident as the basis for its finding of guilt, but it did find that the incident occurred.  Yorkston testified that while Complainant was lying on the bed, he moved the bottom of her swimsuit aside in order to take a picture of her crotch.  He admitted that in so doing, his hand touched her "crotch area."  His testimony indicates that the camera incident occurred sometime after he heard her say no.

Although this testimony arguably provides substantial evidence for each of the elements of fourth-degree sexual assault, it cannot sustain the conviction in this case because the camera incident was not charged in the indictment, nor was it a lesser included offense.

A trier of fact may convict on a lesser offense if "there is a rational basis in the evidence for a verdict acquitting the defendant of the offense charged and convicting him of the included offense."  <u>Kinnane</u>, 79 Hawai'i at 49, 897 P.2d at 976 (quoting <u>State v. Kupau</u>, 76 Hawai'i 387, 390, 879 P.2d 492, 495 (1994) (citation and internal quotation marks

omitted)). The common-law scheme for lesser included offenses was codified by statute as follows:

> § 701-109. **Method of prosecution when conduct establishes an element of more than one offense.** (1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:
>
> > (a) One offense is included in the other, as defined in subsection (4) of this section; or
> >
> > . . . .
>
> (4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:
>
> > (a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
> >
> > (b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or
> >
> > (c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

HRS § 701-109 (1993). Fourth-degree sexual assault may be a lesser included offense within second-degree sexual assault under paragraph (c) because it involves a "different state of mind indicating a lesser degree of culpability" and it "envisions a less serious injury or risk of injury." Kinnane, 79 Hawai'i at 982-83, 897 P.2d at 55-56 (internal quotation marks and citation omitted).

In Kinnane, the lesser included offense stemmed from the same conduct as that alleged in the complaint. Id. at 975-76, 897 P.2d at 48-49. Here, the indictment alleges different conduct than the camera incident. Count VII charges second-degree sexual assault on the basis that Yorkston

> intentionally engage[d] in conduct which, under the circumstances as he believed them to be, constituted a substantial step in a course of conduct intended to culminate in his commission of the crime of Sexual Assault

18

in the Second Degree against [Complainant], by attempting to place his penis in her genital opening, thereby committing the offense.

The charge therefore stemmed from Yorkston's attempt at penetration. By all accounts, the camera incident was a separate act that occurred some time after the penetration attempts. The indictment does not allege any facts or offenses pertaining to the camera incident.

A separate act, giving rise to a separately punishable offense, cannot be the basis for a lesser included offense. The Hawaiʻi Supreme Court has held that where "two different criminal acts are at issue, supported by different factual evidence even though separated in time by only a few seconds, one offense by definition cannot be 'included' in the other. The defendant can properly be punished for both, under different, or the same statutory provisions." State v. Mendonca, 68 Haw. 280, 284, 711 P.2d 731, 735 (1985) (quoting State v. Pia, 55 Haw. 14, 19, 514 P.2d 580, 584-85 (1973) (emphasis omitted)). Because the camera incident was a separate act from the attempted penetration, it cannot be a lesser offense included in Count VII.

Moreover, under the Hawaiʻi Constitution, "the prosecution must allege all essential elements of an offense in the charging instrument." State v. Jess, 117 Hawaiʻi 381, 393, 184 P.3d 133, 145 (2008). An indictment must contain "an allegation of every fact which is legally essential to the punishment." Id. (quoting Apprendi v. New Jersey, 530 U.S. 466, 510 (2000) (Thomas, J., concurring)). Without a proper charge, a conviction "constitute[s] a denial of due process." State v. Elliott, 77 Hawaiʻi 309, 311, 884 P.2d 372, 374 (1994) (quoting State v. Jendrusch, 58 Haw. 279, 281, 567 P.2d 1242, 1244 (1977)); see also State v. Israel, 78 Hawaiʻi 66, 71, 890 P.2d 303, 308 (1995) (noting that defendants should not be forced to "speculate as to what crime [they] will have to meet in defense.") (internal quotation marks and citation omitted); HRS

19

§ 806-34 (1993) (requiring that indictment contain allegations sufficient to "give the accused reasonable notice of the facts."). Because the indictment does not charge Yorkston with any offense relating to the camera incident, nor even allege any facts pertaining to it, the testimony regarding that incident cannot sustain the conviction under Count VII.

B. Yorkston's Other Points of Error

Because we reverse Yorkston's conviction for insufficiency of evidence, we need not address his other points of error.

V. CONCLUSION

For the foregoing reasons, we conclude that there is insufficient evidence to support Yorkston's conviction for sexual assault in the fourth degree. Accordingly, we reverse the Circuit Court's Judgment of Conviction and Probation Sentence/Notice of Entry entered on February 11, 2009 and the Free Standing Order of Restitution entered on February 24, 2009.

DATED: Honolulu, Hawai'i, May 17, 2012.

PAUL J. CUNNEY
VICTOR J. BAKKE
DEAN C.M. HOE
MARCUS B. SIERRA
(Paul J. Cunney, A Law
 Corporation)
for Defendant-Appellant

Presiding Judge

JAMES M. ANDERSON
Deputy Prosecuting Attorney
City and County of Honolulu
for Plaintiff-Appellee

Associate Judge

Associate Judge